**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **IMA UKOR**<br>6508 Flowerdew Hundred Ct.<br>Centreville, Virginia 20120<br><br>*Plaintiff,*<br><br>v.<br><br>**GEORGE MASON UNIVERSITY**<br>4400 University Drive<br>Fairfax, Virginia 22030 | Case No.: _____ |

**COMPLAINT**
(Jury Trial Demanded)

COMES NOW, the Plaintiff, **IMA UKOR** (hereinafter referred to as "Plaintiff" or "Ms. Ukor"), by the undersigned counsel, and files this Complaint against the Defendant, **GEORGE MASON UNIVERSITY** (hereinafter referred to as "Defendant" or "GMU"), and alleges the following:

**PARTIES**

1.      Plaintiff is over the age of eighteen (18) and a resident citizen of the State of Virginia, residing in Centreville, Virginia. She worked for GMU at its Fairfax campus as a Community Assistant.

2.      The Defendant, GMU, is a public institute of higher education primarily located and operating in the Eastern District of the Commonwealth of Virginia with its main campus being in Fairfax, Virginia. Defendant is an "employer" under the meaning of 42 U.S.C.§2000e(b).

1

## JURISDICTION AND VENUE

3.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4); 42 U.S.C. § 2000e-5(3)(3); and 28 U.S.C. §1367.

4.      Venue is proper in this district, pursuant to 28 U.S.C. § 1391 because Defendants are located in the district and all of or a substantial part of the events and omissions giving rise to the proceeding claims occurred in this judicial district.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.      Plaintiff timely filed a Charge of Discrimination (Charge No. 846-2020-20052) against Defendant with the Equal Employment Opportunity Commission ("EEOC").  On or about October 25, 2022, Plaintiff received the EEOC issued a Right to Sue Notice. This suit is timely filed within 90 days thereof satisfying the requirements of 42 U.S.C. Section 2000(e).

## NATURE OF THE CASE

6.      This action is brought for discrimination in employment pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17.

## FACTS

7.      During the Fall 2019 semester, Plaintiff was a student and worked for Defendant, GMU at its Fairfax campus as a Community Assistant in the Whitetop Hall dorm.

8.      Plaintiff was the only black female Community Assistant at the Whitetop Hall dorm.

9.      Defendant's employee, Christopher Gremillion, who is an older Caucasian male, was the direct supervisor of Plaintiff.

10.      Plaintiff felt as though she was treated differently and unfairly compared to her co-workers.

11.     Plaintiff began to feel uncomfortable and scared around her supervisor because she noticed he was paying more attention to her than her co-workers.

12.     Christopher Gremillion would constantly call Plaintiff to his office, close the door, and conduct one-on-one meetings with Plaintiff. He did not conduct these regular meetings with other co-workers/Community Assistants.

13.     Christopher Gremillion would stare at Plaintiff during the meetings, making her feel extremely uncomfortable.

14.     Whenever the co-workers/student Community Assistants had a disagreement or misunderstanding, Christopher Gremillion would blame Plaintiff and require her to come to his office, close the door, and conduct one of the one-on-one meetings.

15.     During the meetings, her supervisor would stare at her breasts and gaze at her for long periods of time.

16.     Plaintiff found that her supervisor was coming up with more and more reasons to conduct the one-on-one meetings, and she began to question why she had to attend.

17.     Plaintiff requested that she no longer be required to attend such meeting.

18.     A non-black co-worker of Plaintiff's had her dormitory photo vandalized at one point, and when she reported it to their supervisor, Christopher Gremillion conducted a double investigation and stated that he would not stop until he found out who did this to her. They found out who the student was and the supervisor made sure he was punished accordingly.

19.     On several occasions, Plaintiff's dormitory photo was similarly vandalized. Plaintiff also reported this to her supervisor, Christopher Gremillion who ignored her reports and/or did not conduct an investigation to find out who was targeting Plaintiff.

20.     Plaintiff felt as though the treatment she received and disregard over her vandalized

photo was related to her being black and the co-worker not being black; and in retaliation for reporting that she no longer wished to attend the one-on-one meetings.

21.     Plaintiff was very clear that she no longer wished to attend these one-on-one meetings, and attempted to prevent herself from being alone with Christopher Gremillion.

22.     On or about the evening of October 25, 2019, her supervisor, Christopher Gremillion required Plaintiff to conduct "rounds" with him, despite the fact that he never did rounds with other co-workers.

23.     Her supervisor could have asked that another student attend the rounds, or that the student who worked at the desk attend the rounds, and was instructed by his director to have another student do the rounds with Plaintiff, However, Christopher Gremillion ignored that instruction and scheduled himself to do the rounds alone with Plaintiff.

24.     During the rounds on October 25, 2019, Christopher Gremillion held the door for Plaintiff as she walked into the unoccupied stairwell. He knew they were alone, and as she walked into the stairwell he groped her buttocks.

25.     Plaintiff was very frightened and quickly complete the walkthrough and returned to her dorm where she suffered fear, anxiety, and humiliation.

26.     The next day, in order to avoid her supervisor, Plaintiff called out of her shift.

27.     In the days following the October 25th incident, Plaintiff felt increasingly targeted by her supervisor.

28.     After the October 25th incident, her supervisor began treating Plaintiff much more negatively and unfairly. For example, November 4, 2019, he emailed Alexis Plater to frivolously complain about Plaintiff.

29.     Through November 2019, Plaintiff continued to complain to her directors and

attempt to get out of the supervision of Christopher Gremillion. Her directors, however, would notify Christopher Gremillion of her complaints. On one occasion, when Plaintiff planned to meet with her director at a coffee shop to discuss what happened in October, the same director told Christopher Gremillion about the meeting and Gremillion showed up to the same coffee shop at the same time, intimidating Plaintiff.

30.     In January, after winter break and upon returning to campus for Spring semester, Plaintiff continued to request that she no longer be required to be alone with Christopher Gremillion.

31.     Plaintiff requested that the meetings be done telephonically, however her initial requests for this were denied. The Associate Director, Christian Barber did not allow for the phone option, and told her she must continue to communicate with Christopher Gremillion "in whatever fashion is most conductive to their schedules and styles." He also declined her request to relocate.

32.     All of the directors and supervisors at this time were aware of the inappropriate incident between Christopher Gremillion and Plaintiff and all were aware that she no longer wished to be alone with him.

33.     On or about January 15, 2020, Christopher Gremillion emailed the Assistant Director, Asa Mack for suggestions on how to appropriately respond to Plaintiff request to end the one-on-one meetings, suggesting that he offer to do them over the phone with Plaintiff and Asa Mack responded, "Personally, I would not want to bend for her however I do want you to be comfortable as well."

34.     Plaintiff attempted to report the harassment and sexual assault to her directors and Emily Gleason, who stopped her from filing a Title IX report and told her to do mediation through housing. Ms. Gleason never explained to Plaintiff how to file an online report or mention that it

was an option for Plaintiff.

35.     In February, because her supervisor was still attempting to schedule meetings with her and she was denied relocation, Plaintiff filed a report with the Mason Police Department. She was told that the person who ripped her photos had a right to do so and that they would not be reporting the sexual harassment because Officer Donald Daniels stated, "People get hemmed up when its just not true." Plaintiff was told that what she experienced by her supervisor was "not serious" and was "not an emergency".

36.     Plaintiff was then yelled at for missing her shifts by Lora Learmont. Plaintiff briefly explained the situation and was told that she would assist in finding her a new supervisor. Plaintiff was then offered an emergency change in housing and moved to Presidents Park dorms on the other side of campus.

37.     Plaintiff was then invited to a meeting with the directors and told it would be to assign her to a new supervisor, however, it was not. Instead, Christian Barber proceeded to scream at Plaintiff, shove papers across the table into her chest, and fired her. Plaintiff felt very scared, intimidated and upset, and then was then told to "resign", which she did by email.

38.     Plaintiff was so emotionally distraught, upset, anxious, and intimidated that she left the campus and resided with her parents for the remainder of the year.

39.     Plaintiff then filed for a temporary protective order. However, because she had already moved off campus and left her position, she did not require a permanent protective order.

40.     She participated in the Title IX investigation, however quickly understood that this investigation was bias and the agents/employees of Defendant who were involved with the investigation were very angry at Plaintiff for reporting her supervisor and accusing GMU of being racist against her. The investigation was only conducted because she filed a restraining order and

it was then considered more "serious", but the people who wrote the report put words into Plaintiff's mouth, inaccurately reported what occurred, and indicated that Plaintiff was inconsistent and did not indicate that her supervisors statements were inconsistent -which they were. None of them reviewed the camera footage or ever spent time to ask Plaintiff about the harassment she had endured for several months leading up until the October incident.

41.    Plaintiff petitioned on Gofundme to raise money so she could file a lawsuit for the wrongful and unlawful actions she experienced. Her supervisor, Christopher Gremillion, then filed a defamation suit in retaliation against Plaintiff.

## CAUSES OF ACTION

### COUNT I
### Race Discrimination
### Violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2)

42.    Plaintiff repeats and realleges each and every allegation in the paragraphs above as though fully set forth at length herein.

43.    Defendant and its agents and employees have engaged in intentional racial discrimination in the terms and conditions of the Plaintiff's employment, including, but not limited to, the Plaintiff's termination.

44.    Defendant's differential treatment of Plaintiff based on her race has created a racially hostile environment which stereotyped and denigrated Plaintiff.

45.    Defendant's racial discrimination included, but was not limited to, the following:

A. Treating Plaintiff differently and less favorably than her non-black co-workers;

B. Calling Plaintiff into multiple one-on-one meetings with her supervisor, Christopher Gremillion while not requiring the same for other non-black co-workers;

C. Treating Plaintiff differently than her non-black co-worker when she reported her photo being ripped off the wall, as her complaint was never investigated and her non-black co-

worker who similarly reported the same issue had a double-investigation conducted for her compliant;

D.  Unfairly criticizing Plaintiff and punishing her more harshly than her non-black co-workers;

E.  Plaintiff complained that she felt she was only being reprimanded or written up for minor issues so that her supervisor would have an excuse to conduct the one-on-one meetings.

F.  Blaming Plaintiff for her non-black co-workers misunderstandings and mistakes at work;

G.  Characterizing Plaintiff as angry and argumentative for issues that were a result of harassment and caused by her non-black co-workers and supervisor;

H.  Assigning Plaintiff more duty calls and weekend shifts than her non-black co-workers;

I.  Requiring Plaintiff to do one-on-one rounds in the late night, alone with Christopher Gremillion, while no other co-workers were required to be alone with Christopher Gremillion during rounds;

J.  When complaining of sexual harassment, Defendant ignored Plaintiff's allegations and told her it was not that serious and no investigation would occur;

K.  Plaintiff's complaint for harassment in her workplace was ignored until Plaintiff openly complained that she felt as though her sexual harassment complaint was not taken seriously because she is a black female and because she eventually obtained a temporary restraining order against her supervisor. This investigation was never properly conducted by Defendants agents, as the investigator put words in Plaintiff's mouth and inaccurately reported what Plaintiff was alleging;

L.  Defendants reported that Plaintiff's statements were inconsistent without ever also reporting that her white supervisor's statements were inconsistent, which they were.

M. Defendant accused Plaintiff of reporting the sexual harassment because she was being written up at work and completely ignored the fact that she was actually reporting that her issues at work were due to her rejecting the sexual advances of her supervisor and for reporting that she no longer wanted to be in one-on-one scenarios with her supervisor and that her supervisor was in fact writing her up because that was one of the only ways he could explain needing to be alone with Plaintiff;

N. Plaintiff's supervisor said that Plaintiff's efforts to report sexual harassment by him was "abusing her minority identity for personal gain".

O. Her supervisor, Christopher Gremillion was researching ways to be anti-racist on his computer.

P. Defendant continued to support Plaintiff's white supervisor and treating Plaintiff negatively, disclosing information about her reports, and attempting to convince the public that she was making false statements.

Q. Plaintiff requested the be relocated/transferred to work in another dorm and be taken out of her supervisor's control, and she was denied this request.

R. When requesting to speak with their director about the harassment, Plaintiff was instructed to meet her director at a coffee shop off to talk, however, without telling Plaintiff he also told the supervisor, Christopher Gremillion, who had been harassing her that Plaintiff and their director were meeting. Christopher Gremillion actually then showed up at the coffee shop at the same time as Plaintiff was there to meet their director to intimidate her.

S. Christopher Gremillion said she would not take Plaintiff off from his supervision and he inferred that doing so would be admitting he was guilty.

T. Plaintiff was asked to come to a meeting with her Caucasian director, Christian Barber

wherein she believed they would be discussing her being transferred to a new dorm. Instead, Christian Barber screamed at her during the meeting, shoved paperwork across the table into Plaintiff's chest, and fired her, then told her to resign by email.

U.  Chris Holland breached the school's policy which has not been done for other Caucasian employees or students, when he unlawfully shared information related to Plaintiff's reports against her supervisor with numerous third parties and published and wrote in multiple emails stating:

> The university is bound by the Family Educational Rights and Protection Act (FERPA) and Virginia personnel rules that prevent me from commenting on student records or personnel records without the consent of the student or employee. I can say that many of the statements made in the public allegations are false.

46.  The racially hostile environment was so severe, pervasive, and objectively offensive that it drastically undermines Plaintiff's well-being and effectively deprived her of equal opportunities.

47.  The creation of such a racially hostile environment is the responsibility of Defendants because it is directly created by Defendant's employees and policies.

48.  Defendants have no legitimate or compelling government interest in indoctrinating racial stereotypes and treating Plaintiff, or any employee, differently based upon race, nor is their practice of doing so narrowly tailored to any such interest.

49.  As a proximate result of Defendant's unlawful racial discrimination, as set forth above, Plaintiff has suffered, and continues to suffer substantial losses all to her detriment and in an amount to be shown according to proof.

50.  As a further proximate result of Defendant's unlawful racial discrimination, Plaintiff has suffered, and continues to suffer, physical and emotional injuries, embarrassment,

humiliation, mental anguish and other general damages, all to her detriment, in an amount to be shown according to proof.

51.    Defendant failed to take any appropriate action to redress the discriminatory and hostile work environment conditions imposed on her.

52.    Defendants have engaged in discriminatory practices with malice and reckless indifference to the Plaintiff's federally protected rights, thereby entitling her to punitive damages pursuant to 42 U.S.C. § 1981a.

53.    Plaintiff demands judgment against Defendant, a trial by jury on all issues so triable, and any other relief the Court deems just and proper.

### COUNT II
### Color Discrimination
### Violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2)

54.    Plaintiff repeats and realleges each and every allegation in the paragraphs above as though fully set forth at length herein.

55.    Defendant and its agents and employees have engaged in intentional color discrimination in the terms and conditions of the Plaintiff's employment, including, but not limited to, and the Plaintiff's termination.

56.    Defendant's differential treatment of Plaintiff based on her skin color, pigmentation, complexion, shade or tone has created a racially hostile environment in which the Defendant's institution, itself, stereotypes and denigrates students and employees based on their color.

57.    Defendant's color discrimination included, but was not limited to, the following:

A. Treating Plaintiff differently and less favorably than her non-black co-workers;

B. Calling Plaintiff into multiple one-on-one meetings with her supervisor, Christopher

Gremillion while not requiring the same for other non-black co-workers;

C.  Treating Plaintiff differently than her non-black co-worker when she reported her photo being ripped off the wall, as her complaint was never investigated and her non-black co-worker who similarly reported the same issue had a double-investigation conducted for her compliant;

D.  Unfairly criticizing Plaintiff and punishing her more harshly than her non-black co-workers;

E.  Plaintiff complained that she felt she was only being reprimanded or written up for minor issues so that her supervisor would have an excuse to conduct the one-on-one meetings.

F.  Blaming Plaintiff for her non-black co-workers misunderstandings and mistakes at work;

G.  Characterizing Plaintiff as angry and argumentative for issues that were a result of harassment and caused by her non-black co-workers and supervisor;

H.  Assigning Plaintiff more duty calls and weekend shifts than her non-black co-workers;

I.  Requiring Plaintiff to do one-on-one rounds in the late night, alone with Christopher Gremillion, while no other co-workers were required to be alone with Christopher Gremillion during rounds;

J.  When complaining of sexual harassment, Defendant ignored Plaintiff's allegations and told her it was not that serious and no investigation would occur;

K.  Plaintiff's complaint for harassment in her workplace was ignored until Plaintiff openly complained that she felt as though her sexual harassment complaint was not taken seriously because she is a black female and because she eventually obtained a temporary restraining order against her supervisor. This investigation was never properly conducted by Defendants agents, as the investigator put words in Plaintiff's mouth and inaccurately

12

reported what Plaintiff was alleging;

L.  Defendants reported that Plaintiff's statements were inconsistent without ever also reporting that her white supervisor's statements were inconsistent, which they were.

M.  Defendant accused Plaintiff of reporting the sexual harassment because she was being written up at work and completely ignored the fact that she was actually reporting that her issues at work were due to her rejecting the sexual advances of her supervisor and for reporting that she no longer wanted to be in one-on-one scenarios with her supervisor and that her supervisor was in fact writing her up because that was one of the only ways he could explain needing to be alone with Plaintiff;

N.  Plaintiff's supervisor said that Plaintiff's efforts to report sexual harassment by him was "abusing her minority identity for personal gain".

O.  Her supervisor, Christopher Gremillion was researching ways to be anti-racist on his computer.

P.  Defendant continued to support Plaintiff's white supervisor and treating Plaintiff negatively, disclosing information about her reports, and attempting to convince the public that she was making false statements.

Q.  Plaintiff requested the be relocated/transferred to work in another dorm and be taken out of her supervisor's control, and she was denied this request.

R.  When requesting to speak with their director about the harassment, Plaintiff was instructed to meet her director at a coffee shop off to talk, however, without telling Plaintiff he also told the supervisor, Christopher Gremillion, who had been harassing her that Plaintiff and their director were meeting. Christopher Gremillion actually then showed up at the coffee shop at the same time as Plaintiff was there to meet their director to intimidate her.

S.  Christopher Gremillion said she would not take Plaintiff off from his supervision and he inferred that doing so would be admitting he was guilty.

T.  Plaintiff was asked to come to a meeting with her Caucasian director, Christian Barber wherein she believed they would be discussing her being transferred to a new dorm. Instead, Christian Barber screamed at her during the meeting, shoved paperwork across the table into Plaintiff's chest, and fired her, then told her to resign by email.

U.  Chris Holland breached the school's policy which has not been done for other Caucasian employees or students, when he unlawfully shared information related to Plaintiff's reports against her supervisor with numerous third parties and published and wrote in multiple emails stating:

> The university is bound by the Family Educational Rights and Protection Act (FERPA) and Virginia personnel rules that prevent me from commenting on student records or personnel records without the consent of the student or employee. I can say that many of the statements made in the public allegations are false.

58.  The racially hostile environment was so severe, pervasive, and objectively offensive that it drastically undermines Plaintiff's well-being and effectively deprived her of equal opportunities.

59.  The creation of such a racially hostile environment is the responsibility of Defendants because it is directly created by Defendant's employees and policies.

60.  Defendants have no legitimate or compelling government interest in indoctrinating racial stereotypes and treating Plaintiff, or any employee, differently based upon skin color, pigmentation, complexion, shade or tone, nor is their practice of doing so narrowly tailored to any such interest.

61.  As a proximate result of Defendant's unlawful color discrimination, as set forth

above, Plaintiff has suffered, and continues to suffer substantial losses all to her detriment and in an amount to be shown according to proof.

62.     As a further proximate result of Defendant's unlawful color discrimination, Plaintiff has suffered, and continues to suffer, physical and emotional injuries, embarrassment, humiliation, mental anguish and other general damages, all to her detriment, in an amount to be shown according to proof.

63.     Defendant failed to take any appropriate action to redress the discriminatory and hostile work environment conditions imposed on her.

64.     Defendants have engaged in discriminatory practices with malice and reckless indifference to the Plaintiff's federally protected rights, thereby entitling her to punitive damages pursuant to 42 U.S.C. § 1981a.

65.     Plaintiff demands judgment against Defendant, a trial by jury on all issues so triable, and any other relief the Court deems just and proper.

66.     The aforementioned acts of Defendants were willful, reckless, and malicious acts of unlawful discrimination against Plaintiff and have deprived Plaintiff the enjoyment of all benefits, privileges, terms, and conditions of her employment relationship in violation of 42 U.S.C. § 1981.

67.     Defendants have engaged in discriminatory practices with malice and reckless indifference to the Plaintiff's federally protected rights, thereby entitling her to punitive damages pursuant to 42 U.S.C. § 1981a.

68.     Plaintiff demands judgment against Defendant, a trial by jury on all issues so triable, and any other relief the Court deems just and proper.

## COUNT III
## SEXUAL HARASSMENT

69.     Plaintiff re-alleges and incorporates herein by reference the above and foregoing paragraphs as set out herein.

70.     During Plaintiff's employment with GMU, Defendant, through the conduct of its agents, servants and/or employees, harassed Plaintiff in a sexual nature and subjected Plaintiff to adverse employment actions of a sexual nature and treated her differently than her male co-workers.

71.     Submission to the conduct alleged herein below in Paragraphs was made an implicit part of Plaintiff's employment with Defendant. Defendant's sex harassment included, but was not limited to, the following:

A.  Calling Plaintiff into multiple one-on-one meetings with her supervisor while not requiring the same for other co-workers.

B.  During the meetings, her supervisor, Christopher Gremillion would stare at her breasts.

C.  Having her breasts stared at by her supervisor made Plaintiff very uncomfortable.

D.  Plaintiff complained that she felt she was only being reprimanded or written up for minor issues so that her supervisor would have an excuse to conduct the one-on-one meetings.

E.  Plaintiff complained she felt uncomfortable and no longer wanted to attend one-on-one meetings with Christopher Gremillion. Defendant denied her requests.

F.  On October 25, 2019, Plaintiff was required to do late night rounds alone with her supervisor. No other co-workers were asked or required to do the rounds alone with the supervisor.

G.  On October 25, 2019, Plaintiff's supervisor groped Plaintiff's buttock as they walked into a stairwell alone.

H.  The following day, Plaintiff called out of work saying she had a headache, however, it was because she did not want to confront her supervisor, yet, for the incident that occurred the night prior;

I.  Plaintiff complained to their director that she felt uncomfortable around her supervisor.

J.  Plaintiff was continuously called into more one-on-one meetings with Christopher Gremillion.

K.  On several occasions, Plaintiff requested to be removed from Christopher Gremillion's supervision and was denied this request by directors, such as Asa Mack and Christian Barber.

L.  Throughout November 2019, Plaintiff met with the directors and spoke to them multiple times about the harassment she was experiencing from her supervisor, Christopher Gremillion.

M.  The directors were emailing Christopher Gremillion, stating that they supported him and stated to Christopher Gremillion in an email that, "Personally, I would not want to bend for her..."

N.  The director then shared Plaintiff's concerns and complaints with the supervisor, Christopher Gremillion, which severely escalated the hostility and Plaintiff's fear of further harassment or retaliation.

O.  Plaintiff requested that she no longer be required to do one-on-one meetings and asked to have the meetings conducted by phone instead, however, this request was also denied.

P.  It wasn't until approximately in January that Plaintiff finally was granted ability to conduct the one-on-one meetings telephonically with Christopher Gremillion, despite requesting that she no longer have to be supervised by this man.

Q.  Plaintiff filed a restraining order and reported the sexual harassment and what she believed was sexual assault and was screamed at, accused of abusing her minority identify, and never received a proper investigation, and her director shared information about the investigation with many third parties via email.

R.  Chris Holland breached the school's policy which has not been done for other Caucasian or male employees or students, when he unlawfully shared information related to Plaintiff's reports against her supervisor with numerous third parties and published and wrote in multiple emails stating:

> The university is bound by the Family Educational Rights and Protection Act (FERPA) and Virginia personnel rules that prevent me from commenting on student records or personnel records without the consent of the student or employee. I can say that many of the statements made in the public allegations are false.

S.  On or about February 12, 2020, Christian Barber called Plaintiff and yelled at her over the phone.

T.  Throughout February, as Plaintiff attempted to get out from Christopher Gremillion's supervision and file the reports against him with her supervisors, Emily Gleason, Title IX, and police reports, she missed several shifts because she was ignored and/or denied when requesting to be transferred or to work remotely.

U.  Plaintiff was told by Emily Gleason that instead of investigating her reports, they would attempt to "mediate through housing" instead.

V.  During an in-person meeting with Christian Barber, he screamed at her and shoved papers into her chest from across the table, and she was fired.

72.     After returning from winter break, because her requests continued to go ignored, Plaintiff had an emergency transfer of her dorm room in February 2020 and moved from Whitetop

Hall to live in President's Park to avoid living in the same dorm her supervisor resided.

73.     Defendant failed to take any appropriate action to redress the sexual harassment and hostile work environment conditions imposed on her.

74.     Defendant and its agents, servants and/or employees discouraged Plaintiff from reporting the harassment, and once she received the protective order, they had to further investigate and Defendants conducted a bias investigation and closed the investigation.

75.     As a proximate result of Defendant's unlawful sex harassment, as set forth above, Plaintiff has suffered and continues to suffer substantial losses incurred in seeking subsequent comparable employment, earnings, deferred compensation, earning capacity, back pay, front pay and other employment benefits, all to her detriment, in an amount to be shown according to proof.

76.     As a further proximate result of Defendant's unlawful sex harassment, Plaintiff has suffered and continues to suffer physical personal injuries, embarrassment, humiliation, mental anguish and other general damages, all to her detriment, in an amount to be shown according to proof.

77.     Plaintiff demands judgment against Defendant, a trial by jury on all issues so triable, and any other relief the Court deems just and proper.

## COUNT IV
## RETALIATION

78.     Plaintiff re-alleges and incorporates herein by reference the above and foregoing paragraphs as set out herein.

79.     At all times material hereto, Plaintiff was an employee of Defendant and Defendant an Employer as defined by 42 U.S.C. § 2000e-(b)(f).

80.     Plaintiff complained on numerous occasions, both formally and informally, in person and by email and phone to Defendant regarding the unlawful discrimination and harassment

she was subjected to.

81.     Plaintiff asked to be transferred on several occasions, because of the unlawful discrimination and harassment she was subjected to.

82.     Plaintiff also eventually reported being sexually assaulted to the GMU Police and filed for a protective order against her supervisor. Plaintiff's complaint was also eventually subjected to a Title IX investigation.

83.     As a result of Plaintiff's complaints as described in paragraphs above, Defendant, through its agents, servants and/or employees retaliated against Plaintiff by participating in actions protected under the Civil Rights Act.

84.     By retaliating against Plaintiff for complaining about unlawful harassment and discrimination, Defendant violated Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e2).

85.     The retaliatory conduct taken against Plaintiff by Defendant, included, but was not limited to, the following: reprimanding and writing Plaintiff up for minor issues that others were not written-up for; refusing the investigate vandalism that was targeting her;  denying Plaintiff's requests to end the one-on-one meetings with her supervisor; screaming at Plaintiff during phone and in-person meetings; refusing to allow Plaintiff to transfer; forcing Plaintiff to remain under Christopher Gremillion's supervision; forcing Plaintiff to miss multiple shifts in order to avoid being with Christopher Gremillion; constructive discharge and wrongful termination; after Plaintiff reported the sexual assault incident in October 2019, she was treated very unfairly, ignored, and accused of lying; Defendant's agents/employees published and publicly accused Plaintiff of "abusing her minority identity"; offering false and bias information about Plaintiff during the Title IX investigation; her complaints sent to Directors were forwarded to her supervisor and they responded in offensive and derogatory ways in support of Christopher Gremillion; and

Plaintiff was sued for defamation by Christopher Gremillion in retaliation for her reports made against him.

86.     As a proximate result of Defendant's unlawful retaliatory conduct, as set forth above, Plaintiff has suffered and continues to suffer substantial losses incurred in earnings, deferred compensation, earning capacity, back pay, front pay, and other employment benefits, all to her detriment, in an amount to be shown according to proof.

87.     As a further proximate result of Defendant's unlawful retaliatory conduct, Plaintiff has suffered and continues to suffer physical personal injuries, embarrassment, humiliation, mental anguish and other general damages, all to her detriment, in an amount to be shown according to proof.

88.     Moreover, as a result of Defendant's unlawful conduct, as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs.

89.     Plaintiff demands judgment against Defendant, a trial by jury on all issues so triable, and any other relief the Court deems just and proper.

## DAMAGES

90.     As a consequence of the forgoing misconduct of Defendant, Plaintiff sustained economic damages, pain and suffering, great mental stress, depression, insomnia, shock, and humiliation.

91.     As a consequence of the forgoing conduct of Defendant, Plaintiff has damages in an amount over $500,000.00 and exceeding the jurisdictional requirements of the Court.

## RELIEF

8.     Plaintiff requests that the Court issue the following relief:

    A.  Enter declaratory relief declaring that Defendant have engaged in race and color

discrimination, sexual harassment, and retaliation.

B. Award Plaintiff compensatory and punitive damages for all the mentioned causes of action in an amount to be determined by a jury of her peers;

C. Award Plaintiff attorney's fees, cost and expenses of litigation; and

D. Award such other relief to which Plaintiff may be entitled to under law.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff demands judgment against Defendant in an amount exceeding the jurisdictional requirements of this Court, all together with Court costs, including attorney's fees and costs, plus pre and post judgment interest, and for any other relief which this Court deems just and proper.

_____
*IMA UKOR, Plaintiff*

Dated: January 23, 2023                    By and through her counsels

_____

Alexander Taylor, Esq.
VSB# 29292
Alex Taylor Law, PLC
1622 West Main Street
Richmond, VA 23220
Tel: 804-239-9232
Fax: 866-446-6167
alextaylor@alextaylorlaw.com